## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Nallelys Liseth Caballero-Arauz, | ) | |
| | ) | |
| Plaintiff, | ) | **AMENDED COMPLAINT** |
| | ) | |
| v. | ) | **1:25-cv-15665** |
| | ) | |
| PAMELA BONDI, in her official capacity as | ) | |
| Attorney General of the United States; U.S. | ) | |
| DEPARTMENT OF JUSTICE; SIRCE OWEN, in | ) | |
| her official capacity as Acting Director of the | ) | |
| Executive Office for Immigration Review; | ) | |
| EXECUTIVE OFFICE OF IMMIGRATION | ) | |
| REVIEW; KRISTI NOEM, in her official capacity | ) | |
| As Secretary of the Department of Homeland | ) | |
| Security; U.S. DEPARTMENT OF HOMELAND | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

## INTRODUCTION

1. Plaintiff, a national of Panama, has a pending asylum application before the Executive Office for Immigration Review ("EOIR"). One full business day preceding a merits hearing the Department of Homeland Security ("DHS") filed a motion to pretermit Plaintiff's asylum application, citing an agreement between the Republic of Honduras and the United States.

2. This action challenges the government's interim final rule ("Rule") and related policies purporting to implement the "Safe Third Country" provision of the asylum statute. That provision authorizes the government to enter into international agreements allowing for

the transfer of asylum seekers from the United States to a third country for the adjudication of their protection claims—effectively outsourcing the U.S. asylum process. The Asylum Cooperative Agreement ("ACA") with Honduras is such a bilateral arrangement, under which the United States seeks to remove certain asylum seekers to Honduras rather than permitting them to pursue asylum in the United States.

3. Under 8 U.S.C. § 1158(a)(2)(A), such transfers are permitted only if the third country is "safe" and provides a "full and fair" asylum process, ensuring that individuals will have a meaningful opportunity to seek protection and will not face persecution or torture. In practice, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") have implemented the ACA with a categorical designation asserting that Honduras has a functioning asylum system, despite evidence showing that the country lacks the infrastructure, capacity, and safeguards to guarantee access to fair and effective protection procedures.

4. The Immigration Judge allowed Plaintiff more time to respond to the motion DHS entered to pretermit her asylum application. Plaintiff had a hearing with the Immigration Court on December 29, 2025. Her case was continued until May 7, 2026 to allow adjudication before this Court.

5. Plaintiff seeks declaratory judgment because the government cannot lawfully apply the ACA to her.

6. The government's application of the ACA to Plaintiff contravenes the Safe Third Country provision of the asylum statute and other immigration statutes, constitutes arbitrary and capricious action, and would deprive Plaintiff of her statutory and constitutional rights. The guidance documents issued by DHS and DOJ to implement the ACA are similarly

unlawful. The categorical Designation by DHS and DOJ asserting that Honduras possesses a "full and fair" asylum system is contrary to law, arbitrary and capricious, and precludes the individualized, case-specific determinations mandated by Congress under 8 U.S.C. § 1158(a)(2)(A). Furthermore, the pretermission violates Plaintiff's constitutional rights under the Fifth Amendment, including the right to notice, the right to present evidence, and the right to a full and fair hearing. Finally, the government's reliance on *Matter of C-I-G-M- & L-V-S-G-*, 29 I&N Dec. 291 (BIA 2025) ("*C-I-G-M-*") is unavailing, as the Board of Immigration Appeals misconstrued *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) and relevant statutory provisions in that decision.

## JURISDICTION AND VENUE

7.  This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., including the statutory asylum provision, 8 U.S.C. § 1158; and the Fifth Amendment to the U.S. Constitution. Plaintiff challenges her threatened pretermission and removal under the ACA with Honduras as unlawful, arbitrary, capricious, ultra vires, and unconstitutional. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

8.  Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Defendants are officers and agencies of the United States acting in their official capacities and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

9.  Plaintiff fled Panama due to threats to her life on account of being a witness for the state against a criminal organization that operates in the country. The threat to her life was credible, this same criminal organization killed her long time partner in front of her due

3

to his cooperation with the government against the gang. Plaintiff arrived to the United States on June 4, 2024, and she timely filed an application for asylum, withholding of removal, and CAT protection on December 27, 2024. On December 1, 2025 at 1:00pm she was scheduled for a merits hearing before the Chicago Immigration Court. On November 28, 2025 DHS filed a motion to pretermit Plaintiff's asylum application based on the ACA with Honduras.

10. In that motion, DHS sought the removal of Plaintiff to Honduras. In its filing, DHS asserted that Plaintiff had not expressed a fear of removal to Honduras, notwithstanding the fact that this motion represented the first occasion upon which Defendants had raised any potentiality of removal to Honduras, and that Plaintiff had never been to Honduras. Plaintiff's case was continued, and she now fears that she will be removed to Honduras. In Honduras she fears violence stemming from her status as a Panamanian migrant, and she likewise fears that Honduras will immediately deport her to or otherwise require her to return to Panama. The Immigration Judge in this case has issued a continuance until May 7, 2026 to allow adjudication of this complaint.

**Defendants**

10. Defendant Pamela Bondi is the Attorney General of the United States. She is sued in her official capacity. The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum, withholding of removal, and CAT protection. Defendant Bondi has issued the new DOJ Designation in connection with the ACA with Honduras signed by the current administration.

11. Defendant DOJ is a cabinet-level agency of the United States federal government. The DOJ, through its authority, designated Honduras as a "Safe Third Country."

12. Defendant Sirce Owen is the Acting Director of the Executive Office for Immigration Review ("EOIR"). She is sued in her official capacity. EOIR, through its Immigration Judges, implements the ACA by applying the ACA bar in removal proceedings.

13. Defendant EOIR is the sub-agency of DOJ that, through its Immigration Judges, conducts regular removal proceedings. EOIR has issued challenged Guidance implementing the Rule.

14. Defendant Kristi Noem is the Secretary of Homeland Security. She is sued in her official capacity. Defendant Noem oversees each of the component agencies of DHS. In her official capacity, Defendant Noem is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum and other immigration benefits. Defendant Noem has issued the new DHS Designation in connection with the ACA with Honduras signed by the current administration.

15. Defendant DHS is a cabinet-level department of the United States federal government. DHS is responsible for implementing the ACA with Honduras, including designating Honduras as a Safe Third Country

## FACTS

### Protections for People Fleeing Persecution and Torture

16. Federal law provides three primary forms of protection for individuals fleeing persecution and torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the CAT, see 8 C.F.R. § 1208.16-18.

17. Asylum affords protection to individuals who have a "well-founded fear of persecution" on account of race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. § 1101(a)(42)(A). The Supreme Court has recognized that a ten percent chance of persecution can give rise to a well-founded fear of persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430, 440 (1987). Past persecution gives rise to a presumption of a well-founded fear of future persecution and thus of asylum eligibility.

18. Subject to several narrow exceptions, including the Safe Third Country exception at issue here, Congress has mandated that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States . . . , irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1).

19. Like asylum, withholding of removal protects individuals facing persecution. The withholding provision, 8 U.S.C. § 1231(b)(3), bars the government from "remov[ing] [a noncitizen] to a country if . . . the [noncitizen's] life or freedom would be threatened in that country because of . . . race, religion, nationality, membership in a particular social group, or political opinion." The withholding statute bars removal to any country where a noncitizen can show they would more likely than not be persecuted, not just the noncitizen's country of origin. As with asylum, a showing of past persecution creates presumptive eligibility for relief.

20. Regulations implementing the CAT likewise prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2).

21. The withholding of removal statute and the CAT regulations implement international treaty obligations not to send noncitizens to countries where they face persecution or

torture, known as non-refoulement obligations. The Supreme Court has held that the withholding statute addresses the requirement in Article 33 of the 1951 United Nations Refugee Convention, incorporated into its 1967 Protocol to which the United States is a signatory, that no signatory "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999). The CAT regulations address the requirement in Article 3 of the CAT that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." These prohibitions on refoulement encompass both direct refoulement— sending asylum seekers directly to countries where they face persecution or torture; *and indirect refoulement—sending asylum seekers to countries that then send them onward to persecution or torture.*

**The Safe Third Country Provision, 8 U.S.C. § 1158(a)(2)(A)**

22. Congress created the Safe Third Country provision at 8 U.S.C. § 1158(a)(2)(A) as one of three narrow exceptions to the right to seek asylum. Under the Safe Third Country provision, an individual may not apply for asylum "if the Attorney General determines that the [noncitizen] may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the [noncitizen]'s nationality or, in the case of a [noncitizen] having no nationality, the country of the [noncitizen]'s last habitual residence) in which the [noncitizen]'s life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion,

and where the [noncitizen] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the [noncitizen] to receive asylum in the United States."

**The Safe Third Country Agreement with Canada**

23. Congress enacted the Safe Third Country provision in 1996 in light of negotiations initiated by Canada, which has long been a global leader in refugee protection.

24. The United States first signed the Safe Third Country agreement with Canada on December 5, 2002. In its present form, that agreement provides that an asylum seeker who crosses the U.S.-Canada border may be removed back to the other country to apply for asylum. The agreement first entered into force on December 29, 2004, one month after the United States issued procedural regulations pursuant to regular notice-and-comment procedures.

**The Rule Imposes a Procedural Framework Inconsistent With the Required Safeguards**

25. On November 19, 2019, former Attorney General Barr and former purported Acting DHS Secretary Wolf promulgated the Rule challenged here. 84 Fed. Reg. 63,994. The Rule creates a framework for removals under so-called ACAs—excluding the Canada agreement, which remains governed by separate regulations—by instituting new procedures that apply to noncitizens in removal proceedings.

26. Defendants issued the Rule without following the APA requirements of notice and comment rulemaking followed by a 30-day implementation period. *See* 5 U.S.C. § 553(b)(B), (d). Instead, they asserted the good cause and foreign affairs exceptions to these requirements. *See id*. § 553(a)(1), (b)(B), (d)(3).

27. Under the Rule, an asylum applicant who is subject to an ACA can generally avoid removal only by showing that it is more likely than not that they will be persecuted in the proposed ACA country of removal. However, the Rule and Guidance do not adequately ensure that asylum seekers will have the opportunity to express fears of removal to ACA countries or that they will have the opportunity to make the required showings of likelihood of persecution or torture.

28. The Rule amended DOJ regulations governing regular removal proceedings by authorizing Immigration Judges to order asylum seekers removed to ACA countries before hearing the merits of their asylum, withholding, and CAT claims as to their countries of origin.

29. However, the Rule prohibits Immigration Judges from exercising the broad "public interest" exception conferred on Immigration Judges by the Safe Third Country provision. *See* 8 U.S.C. § 1158(a)(2)(A). The Rule instead provides that only DHS may exercise that discretionary authority.

**The 2019 Designations**

30. The Rule's preamble states that "[p]rior to implementation of an ACA, the Attorney General and the Secretary of Homeland Security" will "make a categorical determination whether a country to which [noncitizens] would be removed under such an agreement provides 'access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'" 84 Fed. Reg. at 63997 (quoting 8 U.S.C. § 1158(a)(2)(A)). These categorical determinations are referred to herein as "Designations."

31. In 2019, the former Attorney General and former purported Acting DHS Secretary and issued a Designation concluding that Guatemala has a full and fair asylum system.

32. On October 16, 2019, former purported Acting DHS Secretary Kevin McAleenan signed a memorandum with the subject line: "Whether Guatemala's Refugee Protection Laws and Procedures Satisfy the 'Access to a Full and Fair Procedure' Requirements of Section 208(a)(2)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1 158(a)(2)(A)." The memorandum concluded that Guatemala meets the statutory requirement of providing a full and fair asylum system. Among other defects, the memorandum contained no discussion of the actual functioning or capacity of Guatemala's asylum system or the country's ability to safely accommodate asylum seekers. Former Attorney General Barr signed an equivalent memorandum with the same subject line on November 7, 2019.

33. On information and belief, the former Attorney General and former purported Acting DHS Secretaries also issued similar memoranda in 2019 or 2020 concerning Honduras and El Salvador. To date, Defendants have not made them public.

**2019 Agency Guidance**

34. On November 19, 2019, Defendant EOIR distributed Guidance to Immigration Judges titled "Guidelines Regarding New Regulations Providing For Implementation Of Asylum Cooperative Agreements."[1] That Guidance stated in part that a noncitizen subject to an ACA is not eligible for asylum, withholding of removal, or CAT protection "unless the Immigration Judge determines" that the ACA "does not preclude the [noncitizen] from applying for asylum in the United States," that the noncitizen "qualifies for an exception to the relevant" ACA; or that the noncitizen "has demonstrated that it is more likely than

---

[1] EOIR Policy Memorandum 20-04, *Guidelines Regarding New Regulations Providing for the Implementation of Asylum Cooperative Agreements* (Nov. 19, 2019)

not that he or she would be persecuted on account of a protected ground or tortured in the third country."

35. The 2019 EOIR Guidance further stated that "[i]mmigration judges should not review, consider, or decide any issues pertaining to any discretionary determination on whether [a noncitizen] who is subject to an ACA should be permitted to pursue asylum in the United States"; and that a noncitizen "who is otherwise barred from applying for asylum pursuant to an ACA may nonetheless file an asylum application with the Immigration Court if DHS files a written notice stating that DHS has decided in the public interest that the [noncitizen] may pursue an application for asylum or withholding of removal in the United States."

**The First Trump Administration's Implementation of the Rule**

36. On November 20, 2019, Defendants began applying the Rule and the 2019 Guatemala ACA to asylum seekers in expedited removal proceedings.

37. When those removals began, the U.S. and Guatemalan governments had not yet developed any plan to ensure that asylum seekers deported under the agreement would be able to access asylum procedures. On November 18, 2019, a briefing prepared for former purported Acting DHS Secretary Wolf stated: "There is uncertainty as to who will provide orientation services for migrants as well as who will provide shelter, food, transportation, and other care."

38. Non-Guatemalan nationals who were removed to Guatemala pursuant to the Rule and the 2019 Guatemala ACA were given preliminary authorization to stay in the country for just 72 hours. Within those 72 hours, they had to decide whether to return to their countries of origin or remain in Guatemala and attempt to apply for asylum there. However, many

11

people had not received adequate information or instructions about the process of applying for asylum in Guatemala to allow them to make an informed decision just days after their disorienting deportation to an unexpected country.

39. Those removed to Guatemala also faced significant pressure to return to their countries of origin.[2] The shelter infrastructure in Guatemala that existed for people removed under the Rule authorized only very brief stays. Guatemala did not provide access to guidance or support for the legal and social service needs that would be necessary if individuals actually wanted to remain in the country and seek protection. The result was indirect refoulement of asylum seekers, which was reportedly just the "result the Trump administration intended."[3]

40. On March 17, 2020, the Guatemalan government suspended removals under its 2019 ACA due to concerns surrounding the spread of COVID-19 and the country's capacity to receive asylum seekers. Removals under the 2019 Guatemala ACA never ultimately resumed.

41. Between November 2019 and March 2020, Defendants removed approximately 945 non-Guatemalan asylum seekers to Guatemala under the Rule, including single women and parents with young children. In October 2020, the Office of the United Nations High Commissioner for Refugees ("UNHCR") informed congressional staff that less than 2 percent of those asylum seekers were actively pursuing asylum claims in Guatemala and that none of them had yet been granted asylum in Guatemala.[4] Additionally, during the

---

[2] See Human Rights Watch & Refugees International, *Deportation with a Layover: Failure of Protection under the U.S.–Guatemala Asylum Cooperative Agreement* (May 19, 2020), Human Rights Watch, *U.S.: Abusive Transfers of Asylum Seekers to Guatemala* (May 19, 2020),
[3] Jason Hopkins, *Trump's Latest Asylum Deal is Working Just as the Administration Intended*, Daily Caller (Dec. 13, 2019).
[4] S. Comm. on Foreign Relations, *Democratic Staff Report, Cruelty, Coercion, and Legal Contortions: The Trump Administration's Unsafe Asylum Cooperative Agreements*, at 23 (Jan. 18, 2021).

four months the 2019 Guatemala ACA was being implemented, Defendants coerced many other asylum seekers into withdrawing their requests for protection and accepting removal to their countries of origin when faced with the prospect of being deported to Guatemala.

42. Likely also due to the COVID-19 pandemic, the 2019 ACAs with Honduras and El Salvador were never implemented under the first Trump administration.

**The Biden Administration Terminated the 2019 ACAs But Failed to Rescind the Rule**

43. On February 2, 2021, former President Biden directed the Attorney General and DHS Secretary to "promptly review and determine whether to rescind the interim final rule" at issue in this case "as well as any agency memoranda or guidance issued in reliance on that rule." Executive Order 14010, 86 Fed. Reg. 8267, 8270. That executive order further directed the Secretary of State to "promptly consider whether to notify the governments of" Guatemala, Honduras, and El Salvador that "the United States intends to suspend and terminate" the 2019 ACAs with those countries. *Id*.

44. On February 6, 2021, the State Department announced that "the United States ha[d] suspended and initiated the process to terminate the Asylum Cooperative Agreements with the Governments of El Salvador, Guatemala, and Honduras."[5] The termination of the 2019 ACAs was "effective after the notice period stipulated in each of the Agreements." *Id*. The notice periods for the 2019 ACAs were three and six months. Therefore, all three 2019 agreements terminated by August 2021.

---

[5] U.S. Dep't of State, *Suspending and Terminating the Asylum Cooperative Agreements with the Governments of El Salvador, Guatemala, and Honduras* (Feb. 6, 2021).

45. However, the government has not announced publicly that it has rescinded the 2019 Designations concerning Honduras, Guatemala, and El Salvador or that it has rescinded the 2019 agency guidance documents.

## New ACAs Signed by the Second Trump Administration

46. On June 25, 2025, the United States signed a new ACA with Honduras, which was published on July 8, 2025. 90 Fed. Reg. 30076. The agreement does not set forth any limitation on the number of people or the nationalities of asylum seekers the United States may remove to Honduras.

47. The State Department reports that Honduras has epidemic levels of gang violence, rape and sexual violence, and other violence against women and lesbian, gay, bisexual, transgender, queer, or intersex ("LGBTQI+") people; "serious restrictions on freedom of expression"; ineffective policing and entrenched corruption; and state violence including torture and extra-judicial killings.[6] The State Department also warns people to "[r]econsider travel to Honduras due to crime" and that "[v]iolent crime, such as homicide, armed robbery, and kidnapping, remains common."[7]

48. The State Department has acknowledged that Honduras has only "a nascent system to provide legal protection to refugees" and that migrants and "asylum seekers with pending cases were vulnerable to abuse and sexual exploitation by criminal organizations."[8] The State Department reports that "[w]omen, children, and [LGBTQI+]" asylum seekers are "especially vulnerable to abuse."[9]

## The Current Administration's Implementation of the Rule

---

[6] U.S. State Dep't, *2023 Country Reports on Human Rights Practices: Honduras*, Apr. 22, 2024.
[7] U.S. State Department, *Honduras Travel Advisory*, Dec. 10, 2024.
[8] *Supra* note 4.
[9] *Id.*

49. On August 20, 2025, Defendant Noem issued an intended ratification of the Rule, which was originally issued in November 2019 on behalf of DHS by former purported Acting DHS Secretary Wolf, who had been found to be serving unlawfully. The intended ratification was published in the Federal Register on September 2, 2025. 90 Fed. Reg. 42309, 42310.

50. On information and belief, Defendants have issued a Designation categorically finding that Honduras has a "full and fair" asylum process. Defendants have not made this new Designation public.

51. On information and belief, Defendants have issued new agency guidance documents to DHS and DOJ personnel—including the ICE attorneys who prosecute regular removal proceedings such as Plaintiff's, and Immigration Judges—that, together with the guidance documents previously issued in 2019, provide for the implementation of the Rule and Designation in removal proceedings (collectively "Guidance").[10]

52. On information and belief, the Guidance authorizes and/or directs Immigration Judges to pretermit applications for asylum, withholding of removal, and CAT protection as to the original proposed country of removal without permitting the noncitizen to seek withholding of removal or CAT protection with respect to the ACA country.

53. On information and belief, the Guidance also authorizes and/or directs Immigration Iudges to sua sponte order pretermission of applications for asylum, withholding of removal, and CAT protection for removal to a third country pursuant to an ACA.

54. On information and belief, the Guidance authorizes and/or directs Defendants to foreclose noncitizens from the opportunity to seek withholding of removal and CAT

---

[10] EOIR, "Guidelines Regarding New Regulations Providing for Implementation of Asylum Cooperative Agreements" (Nov. 19, 2019)

protection either to the applicants' home country or to the proposed ACA country or countries of removal, even though the asylum statute's safe third country provision does not provide an exception from withholding of removal or CAT protection.

**The BIA Decides *C-I-G-M-***

55. The BIA, in *C-I-G-M-* and relying on *Landgraf v. USI Film Prods.* 511 U.S. 244 (1994), asserted that applying the ACA to individuals who entered the United States and applied for relief before the Act's effective date does not constitute retroactive application.

## HARMS TO PLAINTIFF

56. Plaintiff faces harm due to the Rule, Guidance, and Designation, which subjects Plaintiff to denial of her application for asylum, withholding of removal, and CAT protection and to removal to Honduras, a country that is unsafe and that lacks full and fair asylum systems. Plaintiff cannot live safely or find protection in Honduras or her country of origin. Furthermore, Plaintiff is at risk of removal to her home country, if removed to Honduras, where she faces a near certainty of death.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Challenge to the Designations)
(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),
and the APA, 5 U.S.C. § 706(2)(A))

57. The asylum statute's Safe Third Country provision requires that before the government may remove an asylum seeker to a "Safe Third Country" pursuant to an international agreement, it must first determine that the third country is "safe" and would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A).

58. The statute therefore requires Defendants to assess not just whether potential receiving countries have adopted laws, regulations, and policies providing for asylum or equivalent protection but whether receiving countries, in reality, are safe and have procedures and operations in place to effectively provide for asylum or equivalent protection.

59. The Designation does not account for whether Honduras is, in reality, safe and capable of providing full and fair access to protection, as required by the statute.

60. The Designation therefore violates 8 U.S.C. § 1158(a)(2)(A) and is contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**
**(Challenge to the Rule and Guidance)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
**and the APA, 5 U.S.C. § 706(2)(A))**

61. The Safe Third Country provision also requires that before the government may remove an asylum seeker to a "Safe Third Country" pursuant to a bilateral agreement, it must first determine that the third country would provide the asylum seeker "access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection." 8 U.S.C. § 1158(a)(2)(A).

62. The statute therefore requires Defendants to assess whether the proposed country of removal is in fact able to provide a full and fair asylum process to particular asylum applicants based on their specific immutable characteristics. This requires, for example, an assessment that the receiving country provides a full and fair asylum process for LGBTQI+ people and people of an applicants' racial or ethnic background.

63. The Rule and Guidance stipulate that Designations related to this statutory requirement will be made exclusively on a categorical basis. Consequently, the Rule and Guidance preclude Immigration Judges from considering whether an individual asylum seeker

would lack access to a full and fair asylum process in an ACA country, even if that individual has specific reasons to believe they would personally be denied such access in that country.

64. The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**
**(Challenge to the ACA Rule and Implementing Guidance)**
**(Violation of the Fifth Amendment Due Process Clause and Fundamental Fairness)**

65. Noncitizens in removal proceedings are protected by the Fifth Amendment's Due Process Clause. *Zadvydas v. Davis*, 533 U.S. 678 (2001)(the Due Process Clause applies to all persons within the United States, including noncitizens, whether their presence is lawful, unlawful, temporary, or permanent); *Yamataya v. Fisher*, 189 U. S. 86 (1903); *Reno v. Flores*, 507 U.S. 292 (1993) (noncitizens are "persons" entitled to due process); *Landon v. Plasencia*, 459 U.S. 21 (1982); *Mathews v. Diaz*, 426 U.S. 67 (1976).

66. Where Congress confers a statutory right, due process governs its deprivation. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982).

67. Plaintiff lacked requisite notice of the ACA prior to her entry into the United States and before the filing of her asylum application. Denying Plaintiff the ability to anticipate the ACA bar deprives her of a meaningful opportunity to make informed decisions regarding: her choice of refuge and resettlement, whether to apply for asylum, and the allocation of significant financial resources, including tens of thousands of dollars in fees and legal services.

68. Fundamental fairness prohibits retroactively applying a legal bar that Plaintiff could not have anticipated.

69. The Rule therefore violates the Due Process Clause of the Fifth Amendment.

## FOURTH CLAIM FOR RELIEF
### (Challenge to the ACA Safe Third Country Designation Rule and Guidance)
### (Violation of the Fifth Amendment Due Process Clause; Arbitrary and Capricious Agency Action)

70. Due process forbids arbitrary immigration policies that determine the outcome of removal proceedings. *Judulang v. Holder*, 565 U.S. 42, 55–56 (2011) (arbitrary immigration policy violates the APA and core principles of administrative law).

71. Under the ACA framework and *C-I-G-M-*, the Attorney General and DHS may unilaterally designate Honduras or other countries as "Safe Third Countries." Immigration Judges are compelled to treat these Designations as conclusive and binding.

72. The framework allows executive officials to make outcome-determinative decisions in individual removal proceedings without individualized factual review, judicial oversight, or consideration of the applicant's specific circumstances. There is no mechanism permitting an Immigration Judge to assess whether the designated country is actually safe for the applicant and whether the applicant will have meaningful access to a full and fair asylum process in that country.

73. Due process prohibits unilateral executive control over adjudicative proceedings affecting significant statutory interests.

74. When the government seeks to deprive an individual of a protected statutory interest—here, the right to apply for asylum—the procedures must be fair, reasoned, and provide meaningful review. *Mathews v. Eldridge*, 424 U.S. 319 (1976).

75. By eliminating discretion, individualized review, and meaningful oversight, the ACA framework creates an unacceptably high risk of erroneous deprivation.

76. Denying an asylum seeker the opportunity to present their claim in the United States, based solely on a unilateral Executive determination, deprives them of a protected statutory interest without meaningful procedure.

**FIFTH CLAIM FOR RELIEF**
**(Challenge to the ACA Rule and Guidance)**
**(Violation of Article I, § 1 of the U.S. Constitution (Nondelegation Doctrine))**

77. Article I, Section 1 of the United States Constitution stipulates that "all legislative Powers herein granted shall be vested in a Congress of the United States."

78. The Executive may not create new law absent clear congressional authorization. Where Congress has not clearly authorized executive action, the Executive may not unilaterally exercise legislative power. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

79. Here, DHS and the Attorney General are effectively making law by issuing country Designations that automatically bar asylum adjudication.

80. Nothing in the INA clearly authorizes the Executive to extinguish the statutory right to apply for asylum through conclusively binding country determinations.

81. By creating new asylum bars without congressional authorization, Defendants have acted ultra vires and in violation of Article I and the separation of powers.

82. To the extent Congress is construed as having delegated such sweeping authority, that delegation would lack an intelligible principle and would violate the limits imposed by Article I.

**SIXTH CLAIM FOR RELIEF**
**(Challenge to the BIA's Interpretation of Retroactivity)**
**(Violation of 5 U.S.C. § 706(2)(A) – Agency Action Not in Accordance with Law)**

83. In *C-I-G-M-*, the BIA asserted that applying the ACA to individuals who entered before its effective date is not retroactive, citing *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994).

84. *Landgraf* provides that a law is impermissibly retroactive if it attaches new legal consequences to past actions, impairs rights a party possessed, or increases liability for completed conduct. *Id.* at 280.

85. Applying the ACA now imposes new legal consequences on completed conduct, constituting retroactive application under *Landgraf*. As such, the BIA decision in *C-I-G-M-* violates 5 U.S.C. § 706(2)(A).

**SEVENTH CLAIM FOR RELIEF**
**(Challenge to the Rule and Guidance)**
**(Violation of the Safe Third Country Statute, 8 U.S.C. § 1158(a)(2)(A),**
**and the APA, 5 U.S.C. § 706(2)(A))**

86. The Safe Third Country provision contains an exception applicable if "the Attorney General finds that it is in the public interest for the [noncitizen] to receive asylum in the United States." 8 U.S.C. § 1158(a)(2)(A). With respect to regular removal proceedings in Immigration Court, the term "the Attorney General" as used in the statute refers to Immigration Judges.

87. The Rule and Guidance erroneously provide that Immigration Judges lack this authority and that only DHS can make the public interest determination.

88. The Rule and Guidance therefore violate 8 U.S.C. § 1158(a)(2)(A) and are contrary to law under the APA, 5 U.S.C. § 706(2)(A).

**EIGHTH CLAIM FOR RELIEF**
**(Challenge to the Rule, Guidance, and Designations)**
**(Violation of the APA, Arbitrary and Capricious)**

89. The APA requires reasoned and reasonable policy-making.

90. The Rule, Guidance, and Designations are arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

91. Among other reasons, the Rule, Guidance, and Designation are arbitrary and capricious because Defendants adopted procedures unreasonably ill-suited to complying with their non-refoulement obligations; made unacknowledged, inadequately explained, and unjustified departures from prior agency policies and procedures; failed to articulate reasoned explanations for their decisions; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations that run counter to the evidence before the agencies.

### NINTH CLAIM FOR RELIEF
#### (Challenge to the Rule)
#### (Violation of the APA, Notice And Comment and 30-Day Grace Period)

92. The APA requires notice and opportunity for comment prior to the promulgation of regulations. 5 U.S.C. §§ 553(b), (c). Defendants failed to provide notice and an opportunity to comment prior to the Rule's effective date.

93. The APA requires that a regulation be published "no less than 30 days before its effective date." 5 U.S.C. § 553(d). Defendants failed to comply with this requirement with respect to the Rule.

94. Defendants have not articulated reasons sufficient to show good cause why these requirements are inapplicable, nor is the foreign affairs exception applicable.

95. Defendants cannot invoke the "good cause" exception because the Rule addresses a long-term policy choice rather than an unforeseen emergency, and Defendants failed to identify any imminent harm that would have resulted from providing notice and

comment. Policy urgency and enforcement preferences do not constitute good cause under 5 U.S.C. § 553(b)(B).

96. Nor does the foreign affairs exception apply. The Rule governs domestic immigration adjudication and removal procedures, not the negotiation or conduct of foreign relations. Defendants have not identified any concrete diplomatic consequence that would have resulted from public participation in rulemaking. Courts narrowly construe the foreign affairs exception and reject its application where, as here, a rule merely touches on foreign policy but primarily regulates internal agency processes.

## CONCLUSION AND PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court enter declaratory judgment pursuant to 28 U.S.C. § 2201 resolving the parties' concrete and ongoing legal dispute and clarifying Plaintiff's statutory and constitutional rights. Specifically, Plaintiff asks that the Court:

Declare pursuant to 28 U.S.C. § 2201 that the ACA Rule, Guidance, and Designation are unlawful and invalid as applied to Plaintiff because they:

1. Violate 8 U.S.C. § 1158(a)(2)(A) by designating Honduras as a "Safe Third Country" without determining that it is safe and provides a full and fair asylum procedure.

2. Violate 8 U.S.C. § 1158(a)(2)(A) by preventing individualized assessment of whether particular asylum seekers would have meaningful access to a full and fair asylum process.

3. Are arbitrary, capricious, and not in accordance with law under the APA, 5 U.S.C. § 706(2)(A).

4. Violate the Fifth Amendment Due Process Clause by depriving Plaintiff of notice, a meaningful opportunity to be heard, and fair procedures.

5. Violate fundamental fairness and due process by retroactively applying an asylum bar that Plaintiff could not have anticipated.

6. Eliminate individualized review by treating executive Safe Third Country designations as binding, creating a high risk of erroneous deprivation of statutory asylum rights.

7. Violate Article I and the separation of powers because Defendants acted ultra vires by effectively amending the asylum statute and imposing new eligibility bars absent clear authorization from Congress.

8. Unlawfully apply the ACA retroactively, contrary to settled retroactivity principles in *Landgraf*.

9. Violate APA notice-and-comment requirements, 5 U.S.C. §§ 553(b), (c), and (d), by failing to provide adequate notice or opportunity to comment.

Plaintiff further requests that the Court grant such other and further relief as it deems just and proper.


Kai Gigous
Attorney for Plaintiff


Borjas Law Group
150 S. Wacker Drive
Suite 2400
Chicago, IL 60606
kgigous@borjaslawgroup.com
(312) 788-2783